

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

---

No. 02-21-00240-CV

---

TEXAS DEPARTMENT OF TRANSPORTATION, Appellant

V.

MARK SELF AND BIRGIT SELF, Appellees

---

On Appeal from the 97th District Court
Montague County, Texas
Trial Court No. 2020-0331M-CV

---

Before Bassel, Wallach, and Walker, JJ.
Memorandum Opinion on Rehearing by Justice Bassel

## MEMORANDUM OPINION ON REHEARING

## I. Introduction

The core of the controversy is the removal of trees from Appellees Mark and Birgit Selfs' property by a contractor employed by Appellant Texas Department of Transportation (TxDOT), where the contractor cleared brush and trees from a farm-to-market road's right-of-way. The Selfs sued TxDOT and the contractor, claiming that the contractor had removed a number of trees on their property that were outside of the right-of-way. First, the Selfs alleged causes of action for trespass and negligence. To avoid the bar of governmental immunity that they recognized normally protects a State agency from a negligence suit, the Selfs claimed immunity was waived under the Texas Tort Claims Act (TTCA or the Act) because TxDOT exercised such control over the motor-driven equipment used by the contractor that, in essence, TxDOT employees were operating or using that equipment and because that use was a proximate cause of their damages. The Selfs also claimed that immunity was waived under the Act because TxDOT exercised such control over the contractor that it was no longer an independent contractor but instead was TxDOT's employee. The Selfs finally alleged that the destruction of their trees was an intentional taking of their property for a public use and thus constituted an inverse condemnation.

TxDOT responded to the Selfs' suit by filing a plea to the jurisdiction asserting that the Selfs had failed to allege or that the evidence demonstrated that TxDOT's

immunity was not waived because there was no valid waiver under the TTCA and because the Selfs did not have a viable inverse-condemnation claim. The trial court denied TxDOT's plea to the jurisdiction. TxDOT raises two issues on appeal asserting that the trial court erred because TxDOT is protected by sovereign immunity (1) from the Selfs' negligence claim and (2) from the Selfs' inverse-condemnation claim.

We resolve TxDOT's first issue by sustaining it in part and by denying it in part as follows: (1) the trial court erred to the extent that it found a fact issue existed regarding whether TxDOT was exercising such control over the motor-driven equipment used by the contractor to mean that TxDOT was operating or using that equipment, and (2) the trial court did not err by finding that a fact issue existed regarding whether the contractor was not an independent contractor but instead was TxDOT's employee. We sustain TxDOT's second issue because the act that the Selfs rely on to support their inverse-condemnation claim was not intentional in the sense required to support such a claim. We therefore affirm in part as to the denial of the plea to the jurisdiction on the independent-contractor claim and reverse and render in part solely as to the Selfs' claims for negligence and inverse condemnation.

Pending before this court are three motions: a motion for rehearing filed by the Selfs, and a motion for rehearing and motion for rehearing en banc filed by TxDOT. Although we deny both the Selfs' and TxDOT's motions for rehearing, we

3

withdraw our opinion and judgment dated February 10, 2022, and substitute the following opinion and judgment.

## II. Factual and Procedural Background

The Selfs own an approximately 170-acre tract of land that adjoins a farm-to-market road in rural Montague County. The State holds a right-of-way easement that apparently runs a specified distance from the center line of the road. Sometime after the Selfs purchased the property, they replaced the fence fronting the farm-to-market road. The fence that the Selfs replaced sat on the boundary of the right-of-way easement and the portion of the Selfs' tract not burdened by the easement. When the Selfs replaced the fence, they placed the new fence so that it sat two to three feet further inside their property line than the original fence. In other words, the new fence created a two-to-three-foot gap between it and the boundary of the right-of-way easement. The Selfs claim that they built the new fence in this fashion to preserve trees that had grown along the original fence.

To maintain the right-of-way, TxDOT contracted in writing with T.F.R. Enterprises, Inc. (contractor) to remove brush and trees from the right-of-way. At some point, trees were removed up to the Selfs' fence line.

The Selfs sent a letter to TxDOT claiming that twenty-eight trees[1] had been removed that were wholly or partially in the area between the boundary of the right-of-way and their new fence line. The Selfs later documented the removal by

[1]The Selfs later reduced the number of removed trees to twenty-two.

4

having a survey performed that mapped their new fence line, the boundary of the right-of-way, and the location of the trees that they claimed had been improperly removed.

TxDOT claimed that it did not know that the Selfs had moved the fence. The Selfs do not claim that they had previously told TxDOT of the change in the fence's location but seek to shift the blame for the lack of communication to TxDOT by quoting TxDOT's interrogatory response that "TxDOT is not aware of any communications with [the Selfs] prior to clearing or maintaining of trees or vegetation on this project."

The Selfs assert that the trees should not have been removed in the gap between the boundary of their right-of-way easement and their new fence because TxDOT had no right to remove trees from an area outside the right-of-way; the Selfs claim that TxDOT and the contractor "did not acquire and neither has nor ever had any right to travel, work, cross, or otherwise engage in any activity on the [p]roperty outside the [farm-to-market road] public right-of-way."

To attribute responsibility for the trees' removal to TxDOT, the Selfs' brief highlights several provisions in various documents that they claim gave TxDOT control over the decision regarding which trees would be removed in performance of the right-of-way maintenance contract:

> •The General Notes/General Requirements for the contract provided: "[t]rees to be removed shall be marked by the State with a red, white[,] or orange 'X[,]' painted on the trunk"; quantities for tree removal "SHALL BE IDENTIFIED

5

BY THE ENGINEER PRIOR TO WORK BEING PERFORMED"; and "FOR TREES MARKED FOR REMOVAL, THE DIAMETER OF TREES ARE DETERMINED BY MEASUREMENTS OF THE TRUNK CIRCUMFERENCE[.]"

•A pre-construction conference agenda provided that "[t]rees to be removed shall be marked by the State with a red, white[,] or orange 'X[,'] painted on the trunk. For trimming/brush removal (channels) clear 50 feet either side of culvert center line and from right-of-way line to right-of-way line."

•Standards promulgated by TxDOT that were made applicable to the project included the following: "Perform tree and brush removal and trimming from right[-]of[-]way line to right[-]of[-]way line or other widths and locations shown on the plans. . . . Remove trees of various diameters as shown on the plans[] or as directed."

The Selfs also highlight notes from the pre-construction conference, which provided the instruction to "[m]ark additional trees to be removed (not on plans) and get quantities to Chris [Peters with TxDOT] for $ approval."

Further, the Selfs cite to a text message that they claim indicates that TxDOT directed the area from which trees were to be removed:

> Talked to Mike[ Hallum, a TxDOT engineer in the Gainesville area]. He only want[s] trees removed that [are] 28 lf from the CL.[2] He want[s] all tree[s] trimmed from fence to fence. Even those hanging over. That's a clarification. I had interpreted him earlier [to say] that he wanted them removed. He's concerned about [the] cost [of] removing all those trees.

Further, the Selfs reference an email containing the following communication between TxDOT employees:

> Mike[ Beaver, a TxDOT district engineer] – Just to let you know, Shane [Watkins, a TxDOT supervisor in Montague County] contacted me earlier today about a property owner upset about trees cut down near his

---

[2]We interpret "lf" to mean linear feet and "CL" to mean center line.

property. *Todd [Russell, a TxDOT inspector in Montague County] did direct the contractor to cut the trees down, but they were on the state highway side of the fence.* Since this complaint, they did determine that it is a 100' ROW out there[,] and after measuring with a wheel[,] one of the trees is maybe 6" on his property[,] and all others are within that 50' ROW from center[ ]line. [Emphasis added.]

Continuing, the Selfs reference an interrogatory response from TxDOT that they claim suggests TxDOT's involvement in the decision to clear the trees from fence to fence:

**Request for Interrogatories No. 6:**

Please identify any efforts TxDOT or T.F.R. took to ensure it was only clearing or maintaining trees or vegetation within the FM677 public right-of-way and not on private property.

[Answer] Fence-to-fence has been the standard method of determining the right[-]of[-]way. Plans were provided and areas were discussed at the pre-work meeting. Plans of the pre-work meeting are produced with TxDOT's *Response to Request for Production of Documents.* There were also phone communications between T.F.R. and TxDOT inspector.

Finally on the question of what direction was given by TxDOT, Mr. Self filed an affidavit stating, "I was informed by TxDOT personnel that the right-of-way was not surveyed, and the contractors were simply instructed to 'clear everything between the fences.'"

Apparently to highlight that TxDOT did not make an effort to determine the dimensions of the right-of-way, the Selfs' brief states that TxDOT acknowledges that it conducted no surveys "in association with [the] project."

7

And the Selfs claim that if TxDOT had issued the instruction earlier to only remove trees within a measured distance of twenty-eight linear feet from the center line of the road and to perform only tree trimming from fence to fence, their trees would not have been cut down.

To compensate them for the loss of the trees, the Selfs sought $250,000 from the State. The State rejected the Selfs' claim by a letter that asserted,

> Our investigation of this matter has been completed and reviewed by the Attorney General's Office. It is their judgment that [TxDOT] committed no act of negligence.
>
> The Real Property Asset Map Survey for this area confirms the measurements for the Right[-]of[-]Way Easement for this roadway. An inspection of the Tree Trimming and Removal project was completed[,] and from the information obtained, it appears that the trees that were impacted were within the Right[-]of[-]Way Easement.

After TxDOT rejected the Selfs' claim, they filed suit against TxDOT and the contractor that performed the right-of-way maintenance.[3] The Selfs' petition asserted claims against TxDOT under the TTCA, relying on the assertion that TxDOT's actions fell under the waiver of sovereign immunity found in Section 101.021(1) of the Texas Civil Practice and Remedies Code that waives immunity for damages caused by the act of a state employee's operating or using motor-driven equipment. The petition alleged that "TxDOT's employee(s), while acting in the course and scope of their employment, were negligent and trespassed by clearing trees on the [p]roperty

---

[3]The Selfs later amended their petition to join the subcontractor—Lyellco, Inc.—that was hired by the contractor.

8

owned by [the Selfs] outside of the public right-of[-]way." The petition also asserted a claim for inverse condemnation by alleging in full that "[t]he above described intentional conduct on the part of TxDOT and its employees resulted in an unconstitutional taking of property owned by [the Selfs]—their trees—under [Article I,] [S]ection 17 of the Texas Constitution without adequate compensation."

TxDOT answered the Selfs' suit and pleaded the defenses of sovereign and official immunity. TxDOT later filed a plea to the jurisdiction, claiming that in view of the State's immunity, the trial court lacked subject-matter jurisdiction over the Selfs' claims.

TxDOT's plea to the jurisdiction challenged the Selfs' negligence claim on the ground that it did not fall within the terms of Civil Practice and Remedies Code Section 101.021's waiver of immunity because no TxDOT employee had used a motor-driven vehicle or motor-driven equipment to remove the Selfs' trees. TxDOT also asserted that no act of its employees damaged the Selfs because the party that TxDOT contracted with to remove the trees was an independent contractor and because the definition of "employee" in the TTCA specifically excludes an independent contractor. The plea to the jurisdiction next attacked the Selfs' inverse-condemnation claim, arguing that there was no evidence that TxDOT's actions were intentional or that the Selfs' property was taken for a public use. TxDOT supported its plea to the jurisdiction with the tree-removal contract, an email exchange with the

Selfs, TxDOT's answers to the Selfs' interrogatories, and the contractor's responses to the Selfs' disclosure requests.

The Selfs responded to TxDOT's plea to the jurisdiction. The response asserted that legal and factual issues existed that warranted the denial of the plea. To bring themselves within the waiver of immunity for motor-driven equipment, the Selfs pointed out that a chainsaw, a bobcat, and a bucket truck were used by the contractor to remove the trees. The Selfs argued that a fact issue existed on the question of whether TxDOT exercised such control over the acts of the contractor that the acts of TxDOT employees were a proximate cause of the Selfs' injuries. Thus, the Selfs asserted that immunity was waived under Section 101.021 because the acts of TxDOT proximately caused damages to the Selfs' property, even if no state employee physically operated the equipment. The Selfs also asserted that a fact issue existed regarding whether TxDOT exercised such control over the contractor's operation or use that the contractor was an employee of TxDOT rather than an independent contractor.

On the inverse-condemnation claim, the Selfs' response asserted that TxDOT's conduct caused damages to the Selfs' property because TxDOT acted intentionally "[b]y ordering its contractor (contrary to the written contract) to remove all trees up to the fence." Further, the Selfs claimed that removal of the trees maintained a public right-of-way and was thus a public use. The Selfs supported their response with twelve exhibits that documented (1) their title; (2) the trees removed; (3) the claim that

10

they made against TxDOT; (4) contracts and communications between TxDOT, the contractor, and the subcontractor; and (5) work records of the subcontractor.

In turn, TxDOT filed a reply to the Selfs' response. The reply argued that under the appropriate standard for determining independent-contractor status, the Selfs' evidence raised no fact issue that the contractor was anything other than an independent contractor. Further, because no TxDOT employee was present when the trees were removed and because the act of removal was performed by an independent contractor, TxDOT was not operating or using motor-driven equipment. On the inverse-condemnation claim, TxDOT contended that the act of ordering the removal of trees was not the type of intentional act that supported an inverse-condemnation claim and that there was no public use that could support an inverse-condemnation claim when damage resulted from an accidental act by the State.

After a non-evidentiary hearing on TxDOT's plea to the jurisdiction, the trial court sent a letter to the parties stating that

> [t]he [c]ourt finds that the [p]lea to the [j]urisdiction goes beyond the pleadings to challenge the existence of jurisdictional facts and that, accordingly, the [c]ourt must exercise discretion to determine whether the jurisdictional determination is ripe for a preliminary hearing. Reviewing all evidence now available in the light most favorable to the [Selfs], the [c]ourt finds that the evidence presented to the [c]ourt raises genuine issues of material fact regarding the jurisdictional issue.

The trial court then entered an order denying TxDOT's plea to the jurisdiction. TxDOT then perfected this interlocutory appeal.

11

## III. Analysis

### A. We set forth the standard of review and the procedural process that we utilize when addressing a plea to the jurisdiction.

"Sovereign immunity protects the State of Texas and its agencies and subdivisions from suit and from liability." *Matzen v. McLane*, No. 20-0523, 2021 WL 5977218, at *3 (Tex. Dec. 17, 2021). "Because the assertion of sovereign immunity implicates the courts' jurisdiction, immunity is properly raised in a plea to the jurisdiction." *Id.*

"Where a government entity challenges jurisdiction on the basis of immunity, 'the plaintiff must affirmatively demonstrate the court's jurisdiction by alleging a valid waiver of immunity.'" *Ryder Integrated Logistics, Inc. v. Fayette Cnty.*, 453 S.W.3d 922, 927 (Tex. 2015) (quoting *Dall. Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex. 2003)). "Whether sovereign immunity defeats a trial court's subject-matter jurisdiction is a question of law . . . ." *Tex. S. Univ. v. Villarreal*, 620 S.W.3d 899, 904–05 (Tex. 2021). "We review orders on pleas to the jurisdiction *de novo*." *Matzen*, 2021 WL 5977218, at *3.

Resolution of a plea to the jurisdiction may be on the pleadings or an evidentiary record; "[a] plea to the jurisdiction 'may challenge the pleadings, the existence of jurisdictional facts, or both.'" *Tex. Dep't of Crim. Just. v. Rangel*, 595 S.W.3d 198, 205 (Tex. 2020) (quoting *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018)).

When a plea to the jurisdiction attacks the pleadings, the following principles apply:

- "If a plea 'challenges the pleadings, we determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause.'" *Id.*

- "In determining whether the plaintiff has met that burden, 'we liberally construe the pleadings, taking all factual assertions as true and looking to [the plaintiff's] intent.'" *Id.* (quoting *City of Ingleside v. City of Corpus Christi*, 469 S.W.3d 589, 590 (Tex. 2015)).

- "If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency[,] and the plaintiffs should be afforded the opportunity to amend." *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226–27 (Tex. 2004).

- "If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend." *Id.* at 227.

The following principles apply to a plea to the jurisdiction that goes beyond a facial challenge to the pleadings:

13

- When "the plea challenges the existence of jurisdictional facts, we must move beyond the pleadings and consider evidence when necessary to resolve the jurisdictional issues, even if the evidence implicates both subject-matter jurisdiction and the merits of a claim." *Clark*, 544 S.W.3d at 770–71.

- When a plea to the jurisdiction requires the consideration of evidence, we utilize a process that mirrors a traditional motion for summary judgment. *Id.* at 771. Thus, the following shifting burdens apply:

    o "Initially, the defendant carries the burden to meet the summary[-]judgment[-]proof standard for its assertion that the trial court lacks jurisdiction." *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012).

    o "If [the defendant carries that burden], the plaintiff is then required to show that a disputed material fact exists regarding the jurisdictional issue." *Id.*

    o "If a fact issue exists, the trial court should deny the plea." *Id.*

    o "But if the relevant evidence is undisputed or the plaintiff fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea as a matter of law." *Id.*

14

o   "In determining whether a material fact issue exists, we must take as true all evidence favorable to the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor." *Clark*, 544 S.W.3d at 771.

o   Finally, a trial court may defer the decision on a plea to the jurisdiction: "[w]hether a determination of subject-matter jurisdiction can be made in a preliminary hearing or should await a fuller development of the merits of the case must be left largely to the trial court's sound exercise of discretion." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000).

We address the question of whether there is jurisdiction on a claim-by-claim basis. *Amador v. City of Irving*, No. 05-19-00278-CV, 2020 WL 1316921, at *7–8 (Tex. App.—Dallas Mar. 20, 2020, no pet.) (mem. op.) ("[T]he Supreme Court has made clear that 'a plaintiff must demonstrate that the court has jurisdiction over . . . each of his claims; the court must dismiss those claims (and only those claims) over which it lacks jurisdiction.'" (quoting *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 152–53 (Tex. 2012))).

**B.  We conclude that TxDOT did not operate or use the motor-driven equipment that was used to remove the Selfs' trees; for this reason, TxDOT's governmental immunity is not waived under Section 101.021 of the Civil Practice and Remedies Code.**

We turn initially to the portion of TxDOT's first issue challenging the trial court's determination that a fact issue existed on the question of whether TxDOT's immunity was waived under Section 101.021 of the Civil Practice and Remedies Code because state employees were a proximate cause of the Selfs' damages by the operation or use of motor-driven equipment.  TxDOT's argument is straightforward: no TxDOT employee physically operated the equipment; therefore, Section 101.021 cannot apply.  The Selfs respond that Section 101.021 does not require the physical operation of motor-driven equipment by a state employee and that no appellate decision adds or could legitimately add that requirement to the statutory provision.  Their position is that the waiver provision "merely requires that the damage '*arise from* the operation or use of a motor-driven vehicle or motor-driven equipment'—not that a TxDOT employee be *physically operating* the vehicle/equipment."  In essence, their argument is that so long as an act of a state employee proximately caused an injury and the injury arises from the operation or use of a motor-driven vehicle, then immunity is waived.

Both parties overlook more than twenty years of precedents that addresses the question of what type of control over a motor-driven vehicle or equipment is required to trigger Section 101.021's waiver.  These precedents diverge.  One line of cases does

16

not require a state employee to be operating the equipment but does require a state employee to be giving precise direction to a third-party operator to invoke the waiver provision. The other line of cases supports TxDOT's position that waiver requires physical operation by a state employee.

We need not decide which line of cases we will follow. Even if we adopt the line of cases accepting that a state employee may operate or use equipment though not in physical control, the evidence fails to raise a fact issue that TxDOT operated or used the contractor's equipment. The generalized instructions that TxDOT allegedly gave the contractor do not rise to the necessary level of control required even by the cases holding that the State can exercise control to such a degree that the State may be considered to be operating or using equipment without physical operation by a state employee.

**1.      We set forth the provision of the TTCA that is at issue and the parties' conflicting interpretations of it.**

The TTCA provides that the State is shielded by governmental immunity unless a provision of the Act waives that immunity. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.025 (stating that "[s]overeign immunity to suit is waived and abolished to the extent of liability created by this chapter" and that "[a] person having a claim under this chapter may sue a governmental unit for damages allowed by this chapter"). TxDOT and the Selfs clash over whether TxDOT's governmental immunity is waived

17

by Section 101.021, which is titled "Governmental Liability" and which reads as follows:

> A governmental unit in the state is liable for:
>
> > (1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:
> >
> > > (A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and
> > >
> > > (B) the employee would be personally liable to the claimant according to Texas law; and
> >
> > (2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

*Id.* § 101.021.

In the trial court, the Selfs argued that a plain-language interpretation of Section 101.021 demonstrates waiver:

> [T]he evidence confirms that acts, omissions, and/or negligence of TxDOT employee(s)—including Mr. Todd Russell—*proximately caused* the property damage suffered by the Selfs. Such proximate-causation-by-an-employee is sufficient to trigger the [TTCA's] waiver of immunity, whether or not the same "employee" is physically operating the equipment when the damage takes place.

The act that the Selfs apparently claim was the proximate cause of the injury was a direction from Mr. Russell "to clear [trees from] 'fence to fence'" or his designating which trees to remove.

18

TxDOT supports its argument—that without physical operation by a state employee, there is no waiver—by citing the Texas Supreme Court's opinion of *LeLeaux v. Hamshire-Fannett Indep. Sch. Dist.*, 835 S.W.2d 49 (Tex. 1992). *LeLeaux* involved a high-school student who injured herself by jumping through the rear emergency exit of a school bus that was parked with its engine turned off while the driver was not in the bus. *Id.* at 50–51. To support its contention that Section 101.021 requires a state employee to be physically operating the vehicle or equipment, TxDOT quotes *LeLeaux* and emphasizes portions of that quote as follows:

> This waiver of immunity [under Texas Civil Practice and Remedies Code Section 101.021] is a limited one. A school district is not liable for a personal injury proximately caused by a negligent employee unless the injury "arises from the operation or use of a motor-driven vehicle or motor-driven equipment." *Id.* The phrase, "arises from[,"] requires a nexus between the injury negligently caused by a governmental employee and the operation or use of a motor-driven vehicle or piece of equipment. **While the statute does not specify whose operation or use is necessary**—the employee['s], the person who suffers injury, or some third party—**we think the more plausible reading is that the required operation or use is that of the employee. This requirement is consistent with the clear intent of the Act that the waiver of sovereign immunity be limited.**

*Id.* at 51 (emphasis added). Thus, TxDOT argues that Section 101.021 creates the bright line that without a state employee at the controls, there is no waiver, i.e., no nexus exists "between the injury negligently caused by a governmental employee and the operation or use of a motor-driven vehicle or piece of equipment." *Id.*

19

**2.** **We set forth the divergent authorities on the question of whether a state employee must physically operate motor-driven equipment for a waiver of immunity to occur under Section 101.021.**

Two opinions followed on the heels of *LeLeaux* holding that the State can exercise such control over motor-driven equipment that, even though a non-State-employed third party is at the equipment's controls, the State is operating or using the equipment. The two opinions are *County of Galveston v. Morgan*, 882 S.W.2d 485 (Tex. App.—Houston [14th Dist.] 1994, writ denied), and *City of El Campo v. Rubio*, 980 S.W.2d 943 (Tex. App.—Corpus Christi–Edinburg 1998, pet. dism'd w.o.j.). These cases' principles have guided the courts that agree that the State can operate or use equipment physically controlled by a third party and have been the target of criticism for those courts that do not agree that operation or use can occur under those circumstances.

*Morgan* involved a claim that arose from an incident in which a truck dumping gypsum allegedly came into contact with an electrical line, causing an injury to a rider on the truck. 882 S.W.2d at 487–88. The truck's driver was an employee of a third-party contractor, but county employees acted as spotters who told the driver when to move forward and when to stop. *Id.* at 488. *Morgan* interpreted the language of Section 101.021 and *LeLeaux*'s definition of the section's terms to hold that the county was operating or using the truck under such facts even though the truck was driven by a non-county-employed third party:

There is no requirement [in Section 101.021] that the vehicle in question be a county vehicle, only that a county employee "used" or "operated" the vehicle. *LeLeaux*[, . . .] 835 S.W.2d [at] 51 . . . . "Operation" refers to "a doing or performing of a practical work," and "use" means "to put or bring into action or service; to employ for or apply to a given purpose." [*Id.*] at 51. The spotters in question were county employees. They were a necessary part of the job. The spotters told the truck driver when to move forward, how far to move, when to raise his bed, how far to raise it, when to lower his bed, and when to stop. The movement of the truck and the laying of the gypsum was within the spotters' sole discretion. If a driver moved his truck contrary to the spotters' direction, he could be fired. *Although the spotters were not the drivers of the trucks, the spotters "used or operated" the trucks by exercising complete control over their "use or operation."*

*Id.* at 490 (emphasis added).

The next opinion, *Rubio*, involved a police officer who arrested a driver for driving with a suspended license. 980 S.W.2d at 944. The driver's family was in the vehicle when the officer arrested him. *Id.* After arresting the driver, the officer instructed the driver's wife, who was not a licensed driver, to follow him in the family's vehicle to the police station. *Id.* The officer allegedly showed the wife how to operate the vehicle by demonstrating the use of the gas and brake pedals. *Id.* While the wife was following the officer, she pulled out in front of another vehicle and was struck by that vehicle. *Id.* When sued, the city that employed the police officer argued that Section 101.021 did not apply because a governmental employee must actually be driving the motor-driven vehicle involved in the accident. *Id.* at 945. As had *Morgan*, *Rubio* did not read *LeLeaux* to mean that a governmental vehicle "had to be driven by a governmental employee, only that a governmental employee 'use' or

21

'operate' the vehicle." *Id.* (citing *LeLeaux*, 835 S.W.2d at 51). *Rubio* quoted the same language that we quoted above from *Morgan* to guide it in deciding whether the officer's directions constituted operation or use of the family's vehicle by the officer's instructing the driver's wife to follow him, explaining how to operate the vehicle, and leaving her with the choice of either following or being abandoned by the side of the road at midnight until other help arrived. *Id.* at 946. *Rubio* concluded that the officer exercised such control over the family's vehicle that he was in operation or use of it. *Id.* at 947.

In the more than twenty years since *Morgan* and *Rubio* were decided, they have been repeatedly cited by the courts of appeals. As noted, some agree with their holdings that precise direction from a governmental employee may constitute operation or use of motor-driven equipment even if the governmental employee is not at the controls. Other courts have found that holding too broad.

One of the first opinions analyzing *Morgan* and *Rubio* involved a claim that a sheriff's deputy had directed a property owner to build a berm on a road adjoining the business in order to cut off an avenue of escape for drag racers being pursued by the police. *Sepulveda v. Cnty. of El Paso*, 170 S.W.3d 605, 609 (Tex. App.—El Paso 2005, pet. denied). After the berm was installed, a driver claimed that he was injured when he hit the berm. *Id.* The driver claimed that the deputy had directed the construction of the berm by the property owner and thus had operated or used the property owner's front-end loader that was used in the berm's construction. *Id.* at 611. After

22

analyzing the holdings of *Morgan*, *Rubio*, and other cases, *Sepulveda* extracted the rule that there may be operation or use by a governmental entity of a third-party's motor-driven equipment if the governmental entity directly controlled the equipment's operation and concluded that *LeLeaux* did not hold otherwise. *Id.* at 613–14. *Sepulveda* concluded that, under its facts, there was no waiver under Section 101.021. *Id.* at 614.

Many of the cases that have followed *Morgan* and *Rubio* have examined whether directions given by law enforcement to a driver constitute operation or use by the State. The Fourteenth Court of Appeals recently performed a thorough analysis of these opinions in a case that involved an officer's telling an unlicensed driver to move the vehicle in which she was a passenger, resulting in an accident after the driver attempted to follow the officer's instructions. *Galveston Cnty. v. Leach*, 639 S.W.3d 268, 273–76 (Tex. App.—Houston [14th Dist.] Dec. 9, 2021, pet. filed). In addition to the prior *Morgan* and *Rubio* opinions, *Leach* inventoried a host of cases that date back to the 1970s and include the following:

- *Jackson v. City of Corpus Christi*, 484 S.W.2d 806, 809 (Tex. App.—Corpus Christi–Edinburg 1972, writ ref'd n.r.e.), involved a claim of negligent traffic control, which the court found not to constitute the operation or use of a motor vehicle.

23

- *Townsend v. City of Alvin*, No. 14-05-00915-CV, 2006 WL 2345922, at *3 (Tex. App.—Houston [14th Dist.] Aug. 15, 2006, no pet.) (mem. op.), involved a police officer's telling an unlicensed driver to go home, and the driver was subsequently involved in an accident. The court held that there was no operation or use because the officer "retained no control over [the driver's] vehicle, and [the driver] suffer[ed] no consequence for disobeying" the officer. *Id.*

- *City of Sugar Land v. Gaytan*, No. 01-18-01083-CV, 2020 WL 2026374, at *6 (Tex. App.—Houston [1st Dist.] Apr. 28, 2020, no pet.) (mem. op.), involved an accident that occurred while police officers were directing traffic during a bike race. The court concluded that the appellee had not alleged facts demonstrating that the "officers' direction or control of traffic constituted 'operation' or 'use' of a motor-driven vehicle" and held that the officers did not operate or use a motor vehicle involved in an accident. *Id.*

- *City of Socorro v. Hernandez*, 508 S.W.3d 1, 10 (Tex. App.—El Paso 2015, pet. denied), involved a police officer's activating his overhead lights and ordering the occupants of a disabled vehicle to push the vehicle out of the road. The court held that there were facts raising a waiver of immunity because "there were allegations and evidence that a

24

governmental employee 'used' or 'operated' a vehicle by directly controlling the actions of the actual operator." *Id.* Noting that the courts had engaged in fact-specific inquiries, the Fourteenth Court of Appeals distilled that "[t]he differing outcomes seem to have turned on whether the drivers in each case had complied with, or were in the act of complying with, the directions of a governmental employee who was present when the accident occurred." *Leach*, 2021 WL 5831123, at *6.

Other cases applying *Morgan* and *Rubio* do not involve following the directions of law enforcement but apply the principle that the terms "operation" or "use" under Section 101.021 require immediate, direct control:

- *City of Houston v. Ranjel*, 407 S.W.3d 880, 885–86 (Tex. App.—Houston [14th Dist.] 2013, no pet.), involved a suit against a city when a contractor's employees were injured while working on an airport's automated people-mover system, which was owned by the city but was operated and maintained by an independent contractor. After discussing *Morgan* and *Rubio*, *Ranjel* concluded that the city did not operate or use the people-mover system because

  > the undisputed evidence . . . show[ed] that [the city] contracted with [the independent contractor] to operate and maintain the [people-mover] system, that no [city] employees were present in the [people-mover] [s]ystem [c]ontrol [r]oom or at the actual scene of the train strike on the day it occurred, and that [the city] had no ability or

25

> contractual authority to control directly the operation or use of the [people-mover] trains.

*Id.* at 889–90.

- *Mt. Pleasant Indep. Sch. Dist. v. Elliott*, No. 06-13-00115-CV, 2014 WL 1513291, at *5 (Tex. App.—Texarkana Apr. 17, 2014, pet. denied) (mem. op.), involved injuries to a student when the brakes failed on a district-owned school bus that was operated and maintained by a third party. After discussing *Morgan*, *Rubio*, and other cases in the direct-control line of cases, *Elliot* concluded that "[t]he control theory of 'use or operation' of a motor vehicle appears to require direct control of the actions of the actual operator of the motor vehicle. Short of that, 'use or operation' under this theory must fail." *Id.*

- *El Paso Cmty. Coll. Dist. v. Duran*, 510 S.W.3d 539, 543 (Tex. App.—El Paso July 22, 2015, pet. denied), involved a student who was injured while riding a college-owned motorcycle provided for a motorcycle-safety class. Again, looking to *Morgan* and *Rubio*, *Duran* concluded that the rule to be derived from those cases was that in *Morgan* and *Rubio*, there was operation and use of a motor-driven vehicle because "the drivers operated the vehicles at the behest of government employees in positions of formal authority because they had no choice in the matter. They felt compelled to obey the employees' orders for fear of losing

something significant: in *Morgan*, loss of employment; in *Rubio*, loss of personal safety." *Id.*

- *Rodriguez v. City of Fort Worth*, No. 07-16-00037-CV, 2017 WL 6459532, at *5 (Tex. App.—Amarillo Dec. 8, 2017, no pet.) (mem. op.), involved a claim by a property owner that the city's independent contractor had erroneously demolished his property. The court rejected the claim that the city had operated or used motor-driven equipment because of its instructions to the independent contractor:

> Here, however, there is nothing in the record to show that City employees were involved with the demolition by "operating" or "using" motor-driven vehicles or equipment or by exercising any control over the independent contractor or its employees. No City-owned motor-driven vehicles or equipment were used in the demolition of [appellant's] property[,] and there is nothing in the record to support [appellant's] bare assertion that City employees were instructing the independent contractor or its employees or exercising any degree of control over the demolition. His pleadings do not establish that any City employee "used" or "operated" any motor-driven vehicle or equipment in carrying out the demolition. Consequently, [appellant] did not show that the City waived its governmental immunity.

*Id.*

- *City of El Paso v. Aguilar*, 610 S.W.3d 600, 602 (Tex. App.—El Paso 2020, no pet.), involved a claim by a pedestrian who was run over by a parade float that was pulled by a truck driven by a third party while the truck's

27

movements were being specifically directed by city employees. After analyzing the cases that we have discussed, the court concluded that the pedestrian had sufficiently pleaded and supported by evidence a waiver of governmental immunity "that the City used or operated the motor vehicle that caused her injury by directing the driver of that motor vehicle to move it forward." *Id.* at 605.

The deviation from the line of cases outlining the direct-control test for operation or use includes cases that advocate for a strict reading of *LeLeaux* and that disagree with the holdings of *Morgan* and *Rubio* and their progeny—that a governmental employee's direct control of a third party can satisfy the operation or use language of Section 101.021. The initial case in this line is *Tarkington Independent School District v. Aiken*, 67 S.W.3d 319 (Tex. App.—Beaumont 2002, no pet.). In *Tarkington*, a school employee told participants in a summer program to move furniture. *Id.* at 321–22. One of the participants used his personal vehicle in the task and injured another participant who was riding on the back of the truck. *Id.* at 322. *Tarkington* held that the trial court erred by denying the school district's plea to the jurisdiction. *Id.* at 326. To reach this holding, the court surveyed a number of authorities and cited the language from *LeLeaux* construing "employee" in Section 101.021 to mean a government employee. *Tarkington* rejected the holdings of *Morgan* and *Rubio* and held that "given the holding in *LeLeaux*[,] we do not accept the proposition, as espoused by these cases, that a school district necessarily engages in

28

'use' or 'operation' of a motor-driven vehicle when it negligently exercises control over non-employees." *Id.* at 325. In essence, *Tarkington* viewed the school district's actions as implicating a failure to supervise the program participant rather than the operation or use of a motor-driven vehicle. *Id.* In *Tarkington*'s view, the appellees were trying to read language into Section 101.021 that it did not have and that violated the construction placed on it by *LeLeaux*:

> Appellees would have us read the statute more expansively than *LeLeaux* stated it should be read. We decline to do so until directed otherwise by the Texas legislature or by the Texas Supreme Court. The record before us establishes that Tarkington I.S.D. did not own the vehicle and [that] its employee did not operate or use the vehicle. There is no nexus between [the injured appellee's] injuries and an employee's negligent operation or use of the vehicle.

*Id.* at 326.

The Waco Court of Appeals followed *Tarkington* in *McLennan County v. Veazey*, 314 S.W.3d 456 (Tex. App.—Waco 2010, pet. denied). *Veazey* dealt with claims against a county and a county commissioner that arose when the commissioner directed a wrecker operator regarding how to extricate a house that was being moved on a trailer from trees in which it had become ensnared. *Id.* at 458. The appellees in *Veazey* cited *Morgan* and *Rubio* to support their claim that the commissioner's direct supervision of the efforts to extricate the house constituted operation or use under Section 101.021. *Id.* at 459–60. The Waco Court of Appeals rejected the appellee's premise and relied on the more restricted holding of *Tarkington*, which it summarized as follows:

29

> The Beaumont Court did not accept [its appellees'] argument or the propositions advocated by *Morgan* and *Rubio*. Instead, and relying on the Texas Supreme Court decision in *LeLeaux*, the Beaumont Court held that [its appellees'] complaint did not fall within the scope of the waiver of immunity under the [TTCA].

*Id.* at 462. Because the commissioner had not operated or used the wrecker, immunity was not waived. *Id.* The Amarillo Court of Appeals has followed the holdings of *Tarkington* and *Veazey*. *See Tavira v. Tex. Dep't of Crim. Just.*, No. 07-14-00046-CV, 2016 WL 736062, at *3 (Tex. App.—Amarillo Feb. 24, 2016, pet. denied) (mem. op.) (holding that supervision by corrections officer of inmate's use of lift machine "did not have the legal effect of 'operation or use' of the telehandler by an employee of the [Corrections] Department").[4]

---

[4]The El Paso Court of Appeals has noted the divergence of *Veazey* and *Tarkington* from the line of cases that permit operation or use under Section 101.021 based on direct control by a governmental employee of a third party:

> On appeal, however, [the governmental entity] raises the argument that the reasoning of *Morgan* and *Rubio* is faulty and conflicts with *LeLeaux*'s pronouncement that the TTCA does not apply to situations in which a government employee was not operating the vehicle responsible for the plaintiff's injuries. We recognize that some Texas intermediate appellate courts have refused to adopt the reasoning of *Morgan* and *Rubio*. *See*[,] *e.g.*, . . . *Veazey*, 314 S.W.3d [at] 462 . . . ; *Elgin Indep. Sch. Dist. v. R.N.*, 191 S.W.3d 263, 268 (Tex. App.—Austin 2006, no pet.); *Tarkington* . . . , 67 S.W.3d [at] 326 . . . . But we have previously concluded that *Morgan* and *Rubio* do not conflict with *LeLeaux*. *See Sepulveda* . . . , 170 S.W.3d [at] 614 . . . .

*Duran*, 510 S.W.3d at 542 n.3.

### 3. The State did not operate or use the motor-driven equipment that was used to remove the Selfs' trees.

To resolve the question of whether the State operated or used the motor-driven equipment to remove the Selfs' trees, it is not necessary for us to decide which line of cases applying *LeLeaux* is correct. The more lenient line, which permits a third party's motor-driven equipment to be operated or used by the State, still requires direct control of that equipment. And direct control appears to mean both close physical proximity to the equipment while it is in operation and direction so precise that the State tells the third party in physical control of the equipment which direction and how far to move. At that point, according to the more lenient line of cases, the nexus envisioned by *LeLeaux* between the State's actions and the operation or use of the equipment exists. Here, that nexus is absent. The direction that the Selfs rely on to establish the operation or use of the contractor's equipment is a generalized direction to remove trees from fence line to fence line.[5] That allegation and its proof

---

[5]The Selfs' argument that TxDOT operated or used motor-driven equipment or vehicles in this case relies heavily on the Texas Supreme Court's recent opinion in *PHI, Inc. v. Texas Juvenile Justice Department*, 593 S.W.3d 296, 304–05 (Tex. 2019). The Selfs cite *PHI* for the proposition that the words in the phrase "operation or use" in Section 101.021 should be given their everyday meaning. *Id.* at 303. *PHI* used that holding to disagree with our court's holding that the term "operation" required "active" operation and rejected the suggestion in *Ryder Integrated Logistics* that active operation is required because the statutory language did not support that reading. 593 S.W.3d at 301, 305–06. *PHI* provides guidance on when operation or use by a state employee ends but little on the question of whether a state employee's control over a third party's physically operating the equipment constitutes operation or use. Thus, we turn to the decades-long litany of cases dealing with that issue for guidance rather

31

does not place a state employee in close proximity to the equipment while it was being used, nor does it create a fact question that the State was guiding the hand on the tiller with such precision that it constituted direct control. Thus, we conclude that the trial court erred by denying the aspect of the State's plea to the jurisdiction predicated on its assertion that there is not a waiver of immunity because the State was not operating or using equipment as those terms are used in Section 101.021 of the Civil Practice and Remedies Code.[6]

---

than trying to glean a guiding principle on the question from the apparently inapposite holding of *PHI*.

[6]In their motion for rehearing, the Selfs argue that we have read a requirement into Section 101.021 that is not found in its language, which is that a measure of control must be exercised by a State employee before there is operation or use of motor-driven equipment by that employee sufficient to invoke the waiver of Section 101.021. As the opinion reflects, neither our standard nor the holdings of the cases that we cite for its formulation are created from whole cloth. The myriad opinions that we analyzed have their genesis in the following statement in the Texas Supreme Court's opinion in *LeLeaux*:

> The phrase, "arises from[,"] requires a nexus between the injury negligently caused by a governmental employee and the operation or use of a motor-driven vehicle or piece of equipment. While the statute does not specify whose operation or use is necessary—the employee['s], the person who suffers injury, or some third party—we think the more plausible reading is that the required operation or use is that of the employee. This requirement is consistent with the clear intent of the Act that the waiver of sovereign immunity be limited.

835 S.W.2d at 51. The Selfs' argument appears to be predicated on an interpretation of Section 101.021 that the motor-driven equipment can be used or operated by anyone so long as a governmental employee had some role that proximately caused property damage, personal injury, or death. Neither the Selfs' brief nor their motion for rehearing explain why such a broad reading is reasonable or why the supreme

32

**C.** **We conclude that there is a fact question regarding whether the contractor who removed the Selfs' trees was TxDOT's employee and not an independent contractor. The trial court did not err by denying TxDOT's plea to the jurisdiction directed at the Selfs' claim that a TxDOT employee—the contractor—caused their damages by operating or using motor-driven equipment.**

We turn now to the remainder of TxDOT's first issue that addresses the Selfs' other avenue to avoid TxDOT's sovereign immunity by arguing that fact issues exist regarding whether the contractor was an "employee" of TxDOT, thus making its operation or use of motor-driven equipment attributable to the State. By this means, the Selfs apparently seek to avoid the obstacle created by having to prove that TxDOT exercised such control over the contractor that the contractor's operation or use of the motor-driven equipment was then attributable to TxDOT, even though no TxDOT employee was at the equipment's controls. TxDOT counters with the argument that the contractor and thus its subcontractor were independent contractors whose acts are not attributable to TxDOT. Because there is evidence that TxDOT controlled the details of the contractor's work in determining the area from which trees were to be removed—both in its contract and through instructions given by TxDOT employees—we conclude that the trial court did not err by denying TxDOT's plea to the jurisdiction on this ground. TxDOT's direction over which trees the contractor was to clear created a fact question regarding whether the

court's differing interpretation is flawed. If the Selfs feel that *LeLeaux*'s interpretation is in error, they will have the opportunity to make that argument to the court with the power to change it.

contractor was an independent contractor or TxDOT's employee.

The TTCA's definition of "employee" is the starting point for the analysis of this issue. Under the statutory definition, an employee "means a person, including an officer or agent, who is in the paid service of a governmental unit by competent authority." Tex. Civ. Prac. & Rem. Code Ann. § 101.001(2). But the definition then goes on to describe categories of those who do not qualify as an employee by stating that the term "does not include an independent contractor, an agent or employee of an independent contractor, or a person who performs tasks the details of which the governmental unit does not have the legal right to control." *Id.* To qualify as an employee, the State must pay the person and exercise control over him. *Ranjel*, 407 S.W.3d at 890.

The overarching question in determining whether a person is an employee or an independent contractor turns on who "has the right to control the progress, details, and methods of operations of the work." *See Limestone Prods. Distrib., Inc. v. McNamara*, 71 S.W.3d 308, 312 (Tex. 2002). We look to two sources to resolve the control question; it can be determined "by evidence of a contractual agreement that explicitly assigns a right to control; and second, in the absence of such contractual agreement, by evidence of actual control over the manner in which the work was performed." *Olivares v. Brown & Gay Eng'g, Inc.*, 401 S.W.3d 363, 368–69 (Tex. App.—Houston [14th Dist.] 2013), *aff'd*, 461 S.W.3d 117 (Tex. 2015). And

[a] written contract expressly providing for an independent-contract relationship is determinative of the parties' relationship in the absence of extrinsic evidence indicating the contract was subterfuge, the hiring party exercised actual control in a manner inconsistent with the contract, or if the written contract has been modified by a subsequent agreement.

*Id.* at 369.

Usually, the question of whether a person is an employee is a question of fact. *Id.* When, however, the facts are undisputed, the question becomes one of law. *Id.* And the interpretation question regarding what level of control is provided by a contract is one of law. *Id.*

In deciding whether the allocation of control impacts the independent-contractor determination, "[a]n independent contractor is one who, in pursuit of an independent business, undertakes specific work for another using his own means and methods without submitting to the control of the other person as to the details of the work." *Id.* at 368. The intensity of control required to conclude that someone is an employee requires control "not merely [of] the end sought to be accomplished, but also the means and details of its accomplishment." *Id.* (quoting *McNamara*, 71 S.W.3d at 312).

Courts generally look to the following factors in deciding whether a contractor is an independent contractor:

(1) the independent nature of the person's business; (2) the person's obligation to furnish necessary tools, supplies, and material to perform the job; (3) the right to control progress of the work, except as to final results; (4) the time for which the person is employed; and (5) the method of payment, whether by time or by the job.

35

*Id.* at 369.

But the independent-contractor determination under the TTCA is tinctured by the fact that the Act's "definition of 'employee' does not require that a governmental unit control *every* detail of a person's work." *Fryday v. Michaelski*, 541 S.W.3d 345, 350 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (quoting *Murk v. Scheele*, 120 S.W.3d 865, 867 (Tex. 2003)).

And in a case outside the TTCA, the supreme court focused the independent-contractor determination on who controlled the act that caused the injury at issue. *See JLB Builders, L.L.C. v. Hernandez*, 622 S.W.3d 860, 864–65 (Tex. 2021). In dealing with a personal-injury claim, the Texas Supreme Court recently provided an overview of the process of determining the independent-contractor question and how that inquiry focuses on who controls the details of the injury-causing event:

> As a general rule, one who employs an independent contractor has no duty to ensure that the contractor safely performs its work. *AEP Tex. Cent. Co. v. Arredondo*, 612 S.W.3d 289, 295 (Tex. 2020). However, an exception to this rule arises when "the employer retains some control over the manner in which the contractor performs the work that causes the damage." *Id.* (quoting *Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 791 (Tex. 2006)); *see also Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985) (adopting Restatement (Second) of Torts § 414 (1977)). A plaintiff can prove the requisite control by establishing that the general contractor either actually controlled the manner in which the subcontractor performed its work or had a contractual right to do so. *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002) (citing *Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 155 (Tex. 1999)). In either case, the "control must relate to the condition or activity that caused the injury." *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 528 (Tex. 1997). Further, the control retained or exercised by the general contractor must "extend[] to 'the means, methods, or details of the independent

contractor's work.'" *Arredondo*, 612 S.W.3d at 295 (quoting *Bright*, 89 S.W.3d at 606); *see also Chapa*, 11 S.W.3d at 156 (noting that a general contractor "must have some latitude to tell its independent contractors what to do, in general terms, . . . without becoming subject to liability").

*Id.* (footnotes omitted).

An opinion that predates *JLB* noted the supreme court's prior application of the Restatement section that it had cited—Section 414 of Restatement (Second) of Torts—and that section's application to a situation analogous to the one before us. *See Rosenthal v. Grocers Supply Co.*, 981 S.W.2d 220, 222 (Tex. App.—Houston [1st Dist.] 1998, no pet.). *Rosenthal* held that directing a contractor to clear a particular tract of land is sufficient control of the details of a contractor's work to obviate the independent-contractor defense. *Id.* Because the general contractor had given the contractor direction to clear a particular tract, *Rosenthal* reversed a summary judgment in the general contractor's favor with the following holding:

> [General contractor] asserted it owed no duty to [appellant] because [contractor] was an independent contractor. "The general rule is that an owner or occupier [of land] does not have a duty to see that an independent contractor performs its work in a safe manner." *Redinger . . .*, 689 S.W.2d [at] 418 . . . . It is the independent contractor's duty to perform its work in a safe manner. *Id.*
>
> *Redinger* adopted the following rule:
>
>> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

*Id.* (citing Restatement (Second) of Torts § 414 (1965)). To create liability, the control must be more than a general right to order the work to stop or start, to inspect progress, or to receive reports. *Id.* It was.

> [General contractor] admits it directed [contractor] to clear the wrong property. Though [general contractor] did not control *how* [contractor] cleared the land, it completely controlled one vital "detail": *what* land was to be cleared. That creates a fact issue on liability, both as to [general contractor's] responsibility for the contractor's acts and also as to [general contractor's] responsibility for its own error.

*Id.*

In *Communities Helping Communities, Inc., v. City of Lancaster*, a federal court applied the holding of *Rosenthal* to conclude that a fact issue existed regarding whether a general contractor was liable for instructing a contractor to demolish a house, even though the general contractor did not control the specific details of the demolition. No. 3:06-CV-1436-P, 2007 WL 9711683, at *5 (N.D. Tex. July 18, 2007) (order). *Lancaster* saw a distinction between the rule that applies to injury cases, which holds that merely telling a contractor when to stop and start work does not create a duty on the part of the general contractor, and the situation before it:

> Because of the focus on physical safety, it is logical that a general contractor who retains control over only the stopping, starting, and progression of the work would not be held responsible for injury to others occurring at the hand of the subcontractor. However, in this case, the injury complained of by [appellant] is not a physical injury[] but rather the alleged improper demolition of property. Accordingly, the Court finds that the City, even if it only retained the right to order or stop a demolition, may have a duty of control over [the contractor] that would make the City liable for an improper demolition at the hands of [the contractor]. Here, both the City and [the contractor] assert that the other had the ultimate responsibility to confirm *what* properties to demolish and *when* the demolition should occur. From the evidence

38

presented, it is unclear whether the City should have contacted [the contractor] to prevent demolition, or vice versa, prior to its occurrence.

*Id.*; *see also Schievink v. Wendylou Ranch, Inc.*, 227 S.W.3d 862, 867 (Tex. App.—Eastland 2007, pet. denied) ("Assuming that [property owner] had a duty to ascertain the correct boundary line and to instruct [fence-building contractor] in that respect and that [property owner] retained control over the location on which [fence-building contractor] was to build the fence, [property owner] had a duty to use reasonable care in the exercise of that control.").

Guided by the precedents suggesting that telling a contractor which land to clear is a sufficient act of control to pierce the shield of independent-contractor status, we hold that the trial court did not err by apparently deciding that there was a fact question at the point it decided to deny TxDOT's plea. We have outlined the provisions of the contract between TxDOT and the contractor and the guidelines setting out TxDOT's supervisory role that appear to give TxDOT control over the central details of which trees were to be removed or the area from which to remove trees. Further, there is an email stating that a TxDOT employee "did direct the contractor to cut the trees down, but they were on the state highway side of the fence." And Mr. Self's affidavit stated, "I was informed by TxDOT personnel that the right-of-way was not surveyed, and the contractors were simply instructed to 'clear everything between the fences.'" The Selfs' brief focuses on this very aspect of

TxDOT's control in arguing that fact issues were raised on the independent-contractor question:

> In addition, even assuming for argument that the Act requires an "employee" to be physically operating the equipment/vehicle at issue, fact issues remain and additional discovery is needed with respect to who exactly was operating the equipment and whether or not those individuals and entities were "employees" as defined by the [TTCA]. *In particular, to the extent TxDOT retained the "legal right to control" the "details" of TFR/Lyellco's work, as suggested by the emails and text messages cited above, then those individuals and entities may satisfy the definition. There is already evidence sufficient to create a fact issue on the "employee" issue—including the extremely detailed nature of the contract itself, and the numerous examples of actual control exerted by TxDOT personnel (both formally and informally) as described above—and additional discovery (including depositions) will be necessary to fully develop that issue.* [Emphasis added.] [Record references omitted.]

We agree that the facts highlighted by the Selfs are sufficient to create a fact question regarding whether the contractor's doing right-of-way maintenance was as an employee or as an independent contractor.

TxDOT does little to join issue with the Selfs' argument. In its opening brief, TxDOT argues as follows:

> TxDOT held a standard pre-construction conference on January 24, 2020, in order for "TxDOT, Contractor, Utility Companies, Law Enforcement Agencies, etc. to discuss the schedule and methods of operation. To acquaint all concerned with the lines of authority and communication and [to] determine the responsibilities and duties of the contract and department personnel." However, after this meeting, T.F.R. had broad discretion on how to complete the project, so long as the job was performed in "accordance with the applicable environmental laws, rules, regulations[,] and requirements" and [the] terms of the contract. T.F.R.'s broad discretion is also demonstrated by TxDOT's simple direction to perform the brush and tree removal from fence line to fence line. This broad discretion is further demonstrated by TxDOT['s] not being present on the ground and only providing

40

direction through a few phone conversations.   [Record references omitted.]

We interpret TxDOT's argument to be that instruction on what area to clear is not sufficient control to create a question on independent-contractor status and that sufficient control exists only if TxDOT actually told the contractor how to cut down the trees.   For the reasons outlined, we conclude that focusing on that level of direction or control is too narrow in this case.[7]

---

[7]TxDOT argues in its motions for rehearing that it cannot be liable for a negligence claim because no person who was an employee of TxDOT removed the Selfs' trees.  In the motions, TxDOT raises the issue that the trees were removed by a subcontractor of the company contracted with by TxDOT for maintenance of the right of way.  TxDOT's rehearing argument now proceeds that the subcontractor could not be an employee who falls within the definition of "employee" found in Section 101.001(2) of the Civil Practice and Remedies Code.  The basis for the new argument is that the subcontractor was paid by TxDOT's contractor and not the State and thus was not "in the paid service of a governmental unit" as required by Section 101.001(2)'s definition.  This argument is a different one from the one that TxDOT raised previously when it argued that both the original contractor and subcontractor were independent contractors of TxDOT because TxDOT did not exercise sufficient control over either for them to be employees.  The cases that TxDOT now cites to support the proposition in the motions for rehearing were not in its prior briefs in this court (nor were they presented to the trial court).  An appellate court "generally do[es] not address issues raised for the first time on rehearing."  *Segundo Navarro Drilling, Ltd. v. San Roman Ranch Min. Partners, Ltd.*, 612 S.W.3d 489, 496 (Tex. App.—San Antonio 2020, pet. denied) (op. on reh'g); *OAIC Com. Assets, L.L.C. v. Stonegate Vill., L.P.*, 234 S.W.3d 726, 747 (Tex. App.—Dallas 2007, pet. denied) (op. on reh'g) ("The sole purpose of a motion for rehearing is to provide the court an opportunity to correct any errors on issues already presented."); *ICM Mortg. Corp. v. Jacob*, 902 S.W.2d 527, 535 (Tex. App.—El Paso 1994, writ denied) (op. on reh'g) ("Rehearing is not an opportunity to test alternative arguments after finding other arguments unsuccessful.").   Further, in the trial court, though TxDOT referenced the relationship of the contractor and the subcontractor, TxDOT did not argue that the subcontractor could not be an employee because it was not paid by TxDOT.  We will not address TxDOT's eleventh-hour issue.

41

With respect to the remainder of TxDOT's rehearing arguments, we overrule them for the following reasons:

- In an argument that is not completely clear to us, TxDOT argues that "the TTCA does not waive sovereign immunity for negligence in exercising some control over an independent contractor." If TxDOT is arguing that the State is liable for the acts of its employees only if they are using motor-driven equipment, the Selfs' argument is that the degree of control exercised by TxDOT over the right-of-way maintenance contractor and subcontractor created a fact question regarding whether a person categorized as an employee under the definition in Section 101.001(2) used the equipment that caused the Selfs' damages. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.001(2); *see also Ranjel*, 407 S.W.3d at 889–92 (conducting of an analysis of both whether city employees used or operated equipment and whether contractor was employee of the city).

- TxDOT challenges our holding by asserting that "the Court's reliance is misplaced because evidence that some control may have been maintained over an independent contractor does not convert an independent contractor into an employee." Again, this argument leaves us at a bit of a loss to understand. The definition in Section 101.001(2) states in part,

  > "Employee" means a person, including an officer or agent, who is in the paid service of a governmental unit by competent authority, but does not include an independent contractor, an agent or employee of an independent contractor, or a person who performs tasks the details of which the governmental unit does not have the legal right to control.

  Tex. Civ. Prac. & Rem. Code Ann. § 101.001(2). Our opinion specifies that there is a fact question regarding TxDOT's control of the detail regarding what area was to be cleared in performance of the maintenance contract. It appears that TxDOT's argument offers an all-or-nothing proposition that even though it retained control over the injury-causing event, if the entity it contracted with to do that work remains an independent contractor for other aspects of its

And even after being confronted by the Selfs' specific arguments, TxDOT does not join issue with them. TxDOT argues that *Rosenthal* is distinguishable because that opinion involved negligence under the common law instead of the TTCA, but TxDOT does not tell us how that distinction matters. TxDOT then tells us that it "did not send its independent contractors specifically onto [the Selfs'] land to remove trees" without telling us why that distinction is pivotal. TxDOT also argues that the contract at issue characterizes the contractor as an independent contractor—an argument that begs the question of whether the control given in the contract's terms and by TxDOT's employees creates a fact question.

TxDOT's reply brief concludes by attempting to distinguish *Rosenthal* because the property owner in that case did not create confusion about the location of its property line as the Selfs did by moving their fence off the boundary of the right-of-way. TxDOT does not explain how the Selfs' possible contributory negligence or

---

work, that entity can never be an employee. That proposition appears contrary to logic and precedent.

- Finally, TxDOT argues that in some way our duty analysis violates Civil Practice and Remedies Code Section 5.001, which specifies that "[i]n any action governed by the laws of this state concerning rights and obligations under the law, the American Law Institute's Restatements of the Law are not controlling." *Id.* § 5.001(b). Apparently, this argument turns on the contention that we improperly relied on Section 414 of Restatement (Second) of Torts and that such section is contrary to Texas law. A cursory reading of our opinion shows that we are citing Texas cases—including two Texas Supreme Court opinions—that adopt and apply Section 414. Thus, we are following Texas precedent.

proportionate responsibility obviates the control that TxDOT exercised or how those issues should guide our resolution at this preliminary stage of the case. None of TxDOT's arguments convince us that the trial court erred by denying the plea to the jurisdiction based on the apparent findings that a fact issue existed on the question of whether the contractor was an independent contractor.[8]

---

[8]TxDOT also argues that it would be against public policy to hold it liable:

> The [Selfs] further argue that TxDOT should have surveyed or measured the right[-]of[-]way or contacted and coordinated with the Selfs prior to the tree removal. However, [the Selfs] cannot point to any authority requiring TxDOT to do such prior to executing the tree and brush removal contract.
>
> The tree and brush removal contract was for the maintenance of highways in three counties: Montague, Clay, and Cooke. It is not financially possible or feasible for TxDOT to survey every tract of property along the right[-]of[-]way in the three counties and to coordinate with every property owner to perform its tree and brush removal. To interpret the TTCA to require TxDOT to do so would be clearly outside the legislature's intent in order to avoid liability in every tree and brush removal contract. [Record references omitted.]

What this argument ignores is that TxDOT is suffering the consequences of how it drafted the contract at issue and, perhaps, the instructions issued by its employees. TxDOT could have protected itself in the contract by limiting the determinations that it took on itself to make. Further, even if we were inclined to consider TxDOT's argument, our record contains no evidence on the issue. To the contrary, the record appears to undermine TxDOT's argument by suggesting that TxDOT took remedial action after the Selfs made their claim when it began measuring 28 linear feet from the center line of the road to establish the zone from which it would remove trees.

44

For the reasons outlined, we sustain in part and overrule in part TxDOT's first issue.[9]

### D. We conclude that the trial court erred by denying the portion of TxDOT's plea to the jurisdiction directed to the Selfs' inverse-condemnation claim.

The Selfs also pleaded a claim for inverse condemnation. In its second issue, TxDOT challenges the trial court's denial of the portion of its plea directed to that claim. We conclude that the trial court erred by denying TxDOT's plea to the jurisdiction on the inverse-condemnation claim. The record does not contain

---

[9]In its briefs, TxDOT argues that there can be no showing that its acts were a proximate cause of the Selfs' damages. As articulated in TxDOT's reply brief,

> First, [the Selfs] were aware when they purchased their property that the fence separated TxDOT's right[-]of[-]way and [their] property. Next, it is common knowledge that TxDOT maintains its right[-]of[-]way. [The Selfs'] act of moving the fence from the right[-]of[-]way line to placing the fence at least two feet onto their property was a substantial factor in bringing about their own injury. Therefore, [the Selfs] are the cause in fact of their own damages. Further, it was not foreseeable to TxDOT that [the Selfs] would move the fence from the right[-]of[-]way line onto their own property. Therefore, it was not foreseeable that [the Selfs'] trees would be removed from their property through the brush and tree removal project. [Record references omitted.]

We pass no judgment on whether this act was negligent on the Selfs' part, but the argument ignores that there can be more than one proximate cause of an injury and that the Selfs have alleged acts that they contend were negligent—removing trees without marking the trees as required by the contract or taking the step of at least measuring to the fence line to determine if it coincided with the boundary of the right-of-way. *See Gregory v. Chohan*, 615 S.W.3d 277, 295 (Tex. App.—Dallas 2020, pet. pending) (en banc) ("Moreover, there can be more than one proximate cause of an accident." (citing *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992))). In our view, the facts raise a question on the issue of proximate cause.

45

evidence of and the Selfs do not identify a potential issue that supports a claim that TxDOT acted with the requisite intent to support an inverse-condemnation claim.

Article I, Section 17 of the Texas Constitution provides a right to compensation when property is taken for a public use: "No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made, unless by the consent of such person . . . ." Tex. Const. art. I, § 17. The doctrine of sovereign immunity "does not shield the State from an action for compensation under the takings clause." *Gen. Servs. Comm'n v. Little–Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex. 2001). "When the government takes private property without first paying for it, the owner may recover damages for inverse condemnation." *Tarrant Reg'l Water Dist. v. Gragg*, 151 S.W.3d 546, 554 (Tex. 2004).

But as we have noted, to withstand a plea to the jurisdiction, a plaintiff must allege a valid inverse-condemnation claim:

> But because the plaintiff in a suit against a governmental entity must allege a valid waiver of immunity to show jurisdiction, a plaintiff in a taking suit must allege a valid taking claim. That is, when the basis for jurisdiction is the assertion of a taking claim, the taking claim alleged must be a valid one. A trial court should therefore grant a plea to the jurisdiction when a government defendant produces evidence to show as a matter of law that the plaintiff cannot establish a viable taking claim.

*City of Keller v. Hall*, 433 S.W.3d 708, 714–15 (Tex. App.—Fort Worth 2014, pet. denied) (footnote omitted); *see also Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 491 (Tex. 2012) ("The jurisdictional question at the heart of this case is whether, considering [the plaintiff's] pleadings and the evidence submitted in the plea to the

jurisdiction proceeding, there are sufficient facts to support an inverse condemnation.").

The elements of an inverse-condemnation claim are "(1) a governmental entity intentionally performed certain acts (2) that resulted in a taking or damaging of property (3) for public use." *City of Dallas v. Zetterlund*, 261 S.W.3d 824, 828 (Tex. App.—Dallas 2008, no pet.).

Though the elements of an inverse-condemnation claim are short and straightforward in their formulation, they have presented a vexing question of how to balance a person's right to be compensated for property taken for public use with the sovereign's immunity from negligence claims that could consume the fisc. *Gragg*, 151 S.W.3d at 554. The Texas Supreme Court has described its quest to balance these concerns and formulate a standard as follows:

> For one, we strive to avoid what would be an anomalous result if the State, an entity otherwise generally entitled to immunity for negligence, were subject to liability for something less than intentional behavior. More importantly, though, we seek to ensure that the public does not bear the burden of paying for property damage for which it received no benefit. As we have noted, our Constitution provides for compensation only if property is damaged or appropriated "'for or applied to public use.'" "That is the factor which distinguishes a negligence action from one under the constitution for destruction." Accordingly, we have sought objective indicia of intent in particular contexts to determine whether property has been taken or damaged in furtherance of the public interest.

*Id.* at 554–55 (citations omitted). The formulation of the intent standard adopted to reach a balance is whether the governmental entity "(1) knows that a specific act is

47

causing identifiable harm[] or (2) knows that the specific property damage is substantially certain to result from an authorized government action — that is, that the damage is 'necessarily an incident to[] or necessarily a consequential result of' the government's action." *City of Dallas v. Jennings*, 142 S.W.3d 310, 314 (Tex. 2004). The supreme court has described this standard as focusing on "mens rea" to make "clear that a taking cannot be established by proof of mere negligent conduct by the government." *Harris Cnty. Flood Control Dist. v. Kerr*, 499 S.W.3d 793, 799 (Tex. 2016) (op. on reh'g). An act of omission by the government is not enough to establish liability for a taking: "We [the supreme court] have not recognized a takings claim for nonfeasance." *Id.* at 800. Also, intent for an inverse-condemnation claim must be tested at the time the governmental entity acted and not with hindsight. *Id.* at 806 (quoting *City of San Antonio v. Pollock*, 284 S.W.3d 809, 821 (Tex. 2009)).

The supreme court also described how its formulation of the intent standard addressed the failures of a standard that would make the State liable for a taking resulting from any intentional act. *See Jennings*, 142 S.W.3d at 313. So broad a standard would make a government entity subject to higher liability than a private individual. *Id.* It would also "ignore the predicate of Article I, Section 17: that the damage be 'for or applied to public use.'" *Id.* "When damage is merely the accidental result of the government's act, there is no public benefit[,] and the property cannot be said to be 'taken or damaged *for public use*.'" *Id.*

The supreme court also felt that the standard it formulated counterbalanced the concern that would arise if the standard required proof of a targeted effort to take property, i.e., one that would require proof that the government intended to cause damage. *Id.* To address this concern, the supreme court's formulation ensures that "if the government knows that specific damage is substantially certain to result from its conduct, then takings liability may arise even when the government did not particularly desire the property to be damaged." *Id.* at 314. Continuing, the supreme court stated that

> [t]here may well be times when a governmental entity is aware that its action will necessarily cause physical damage to certain private property[] and yet determines that the benefit to the public outweighs the harm caused to that property. In such a situation, the property may be "damaged for public use."

*Id.*

In the trial court, the Selfs were clear what intentional act they predicated their inverse-condemnation claim on:

> By ordering its contractor (contrary to the written contract) to remove all trees up to the fence, [i.e.], on [the Selfs'] property, the State acted with sufficient intent. . . . ("Todd [TxDOT employee] did direct the contractor to cut the trees down . . .") . . . . In other words, *TxDOT knew with substantial certainty that trees up to the fence line would be removed.* Thus, the State knew that "specific property damage [was] substantially certain to result from an authorized government action," [i.e.], maintaining the State's right-of-way. [Record references omitted.]

The Selfs simply copied this argument into their appellate brief and added that the intent standard that applies to inverse-condemnation claims has been met because "in

49

the instant case, TxDOT specifically and intentionally directed and instructed that the particular trees at issue be removed."

The Selfs indisputably identify an intentional act, but their argument begs the question at the core of the intent standard: what was the impetus of the intentional act of removing the trees? The answer seems apparent from the underpinning of their claim: TxDOT failed to measure the right-of-way and assumed trees on the road side of the fence were in the right-of-way. That certainly looks like an act of nonfeasance—i.e., an act of negligence—for which TxDOT is not liable for a taking. Though cutting down a tree is an intentional act, the proof is lacking that TxDOT intended to cut down those of the Selfs' trees beyond the right-of-way or was substantially certain that any trees on their private property would be cut down. Again, the formulation of the intent standard in an inverse-condemnation case is designed not to impose a higher standard of liability than would be imposed on an individual by simply making TxDOT liable for any intentional act leading to harm; the Selfs appear to seek to impose exactly that standard of liability. Further, the Selfs do not explain how TxDOT acted in a way that it was "aware that its action [would] necessarily cause physical damage to certain private property, and yet determine[d] that the benefit to the public outweigh[ed] the harm caused to that property." *See id.* The State and the public would surely have preferred that the Selfs' trees had remained standing because the act of removing trees from outside the right-of-way

50

accomplished nothing of benefit for the public; indeed, that act's only result was the creation of the Selfs' claim against the fisc.

Though one of the cases predates the supreme court's pronouncements, the cases that we have found analyzing facts analogous to the underlying facts of the Selfs' inverse-condemnation claim support our holding. *State v. Gafford* involved an inverse-condemnation claim from TxDOT's destroying a landowner's tree while clearing brush and trees from a right-of-way. No. 04-03-00168-CV, 2003 WL 22011302, at *1 (Tex. App.—San Antonio Aug. 27, 2003, no pet.) (mem. op.). On the question of the State's intent, *Gafford* noted that

> [i]t is undisputed that TxDOT was engaged in the construction of U.S. Highway 281. At the hearing on the State's plea to the jurisdiction, the trial court was informed that when TxDOT employees were told to stop clearing the brush and trees on [appellee's] property, they stopped. In his deposition, [appellee] testified that based upon what TxDOT [had] told him, he did not think "they intended to take [his] property." *The evidence reflects that the State did not intend, authorize, or even know that it was removing trees from [appellee's] property until it was so informed. Under these circumstances, the removal of brush and trees on [appellee's] property was not authorized or intended by the State.*

*Id.* at *3 (footnotes and citations omitted) (emphasis added). Here, there is no evidence that TxDOT knew that trees were being removed outside the right-of-way until Mr. Self informed TxDOT of that fact.

The Dallas Court of Appeals distinguished *Gafford* because employees of the City of Dallas were informed by a landowner that the City's contractors were using his property without permission but continued that use for months after being informed

and after agreeing to compensate the landowner for the use. *See Zetterlund*, 261 S.W.3d at 831–32. *Zetterlund* held that there was evidence that damage to the landowner was substantially certain to result from the City's and their contractor's acts because they continued to use the property after being informed that they did not have permission to do so. *Id.* Again, our record contains no evidence that TxDOT had any inkling that it was damaging the Selfs' trees when the area up to their fence was cleared.

The Selfs do not claim that anything else should occur in this case that will allow them to identify an intentional act on the part of TxDOT upon which to base their inverse-condemnation claim. The act that the Selfs identify—removing trees from the roadside to their fence—as the intentional act supporting their inverse-condemnation claim is the result of the negligent act of allegedly failing to take steps to identify the extent of the right-of-way. We hold that such an act is not evidence that raises a fact question regarding whether TxDOT acted with the type of intent necessary to support an inverse-condemnation claim. Thus, we conclude that the trial court erred by denying TxDOT's plea to the jurisdiction directed to the Selfs' inverse-condemnation claim.

We sustain TxDOT's second issue.

## IV. Conclusion

Having sustained the portion of TxDOT's first issue arguing that the trial court erred by denying TxDOT's plea to the jurisdiction on the Selfs' negligence claim that

TxDOT operated or used motor-driven equipment and having also sustained TxDOT's second issue that the trial court erred by denying TxDOT's plea to the jurisdiction on the Selfs' inverse-condemnation claim, we reverse the portions of the trial court's order denying TxDOT's plea to the jurisdiction as to those claims and render judgment dismissing those claims. Having overruled the portion of TxDOT's first issue directed at the Selfs' claim that the contractor was TxDOT's employee, we affirm the remainder of the trial court's order denying TxDOT's plea to the jurisdiction on that claim.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: April 28, 2022